WILLIAM A. SNOWARDT, APPELLANT, v. CITY OF KIMBALL, KIMBALL COUNTY, NEBRASKA, APPELLEE.

117 N. W. 2d 543

Filed October 26, 1962. No. 35290.

Heaton & Heaton, for appellant.

Halcomb, O'Brien & Everson and Harry R. Meister, for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

SPENCER, J.

This is a workmen's compensation case. The plaintiff sought medical expenses and compensation for an injury allegedly sustained on September 6, 1959, while employed as a policeman by the city of Kimball. The one-man compensation court found that plaintiff sustained a temporary disability as the result of the accident on that date but that his present disability is the result of a subsequent accident which had no connection with his employment. Plaintiff elected to appeal directly to the district court for Kimball county.

After a trial in the district court, specific findings were made that the plaintiff had suffered a back injury in other employment August 20, 1956; that he had sustained a temporary disability involving no compensable loss of time in an accident on September 6, 1959; and that subsequently, on October 27, 1959, he suffered another accident outside of his employment. The court further found that the plaintiff had failed to maintain the burden of proving that the accident of September 6, 1959, was the proximate cause of his present disability, and allowed him a recovery only for the medical expenses incurred between the time of the accident on September 6 and September 25. From this judgment plaintiff appeals to this court. The cause is here for trial de novo on the record. Anderson v. Cowger, 158 Neb. 772, 65 N. W. 2d 51.

William A. Snowardt, hereinafter referred to as the plaintiff, on September 6, 1959, was 40 years of age, was 6 feet 2 inches tall, and his normal weight was 245 pounds. He was employed as a night policeman for the city of Kimball at a salary of $315 per month. About 1 a.m. on that day, while patrolling with another officer, he came upon two drunks who were fighting near a tavern and dance hall located within the city limits of Kim-

ball. One of the men, weighing about 160 pounds, had his arm around the neck and throat of the other man and was choking him. Plaintiff, in attempting to break the hold, lifted the man off the ground about 6 inches, at least twice. He testified that on this occasion he experienced a sharp stabbing pain in his back and released his hold. He then struck the man with the side of his hand on the jaw, broke the hold, and made an arrest. He continued to work the rest of the night. The next morning at 8 o'clock, when he picked up the chief of police, he told the chief of the incident.

Plaintiff testified that he was in severe pain when he went home that morning and that his wife used a heat lamp on his back to relieve the pain. The testimony of the wife is to the effect that, as she remembers, she used the heat lamp for 3 successive days. She also testified plaintiff could not bend down and she had to help him put on his socks and pull up his trousers. Plaintiff further testified that he experienced continuous pain thereafter but did not consult a doctor for a week or 10 days. The medical evidence is that a doctor was not consulted for 17 days, or until September 23, 1959, at which time plaintiff made an office call on Doctor Siedenburg of Kimball. On that same day he also consulted a chiropractor at Pine Bluffs, Wyoming. He made office calls on Doctor Siedenburg again on the 24th and 25th of September. The doctor gave him medication and physical therapy, and advised him to wear a wide belt.

On the 27th of October 1959, plaintiff was helping a neighbor put an extension on a TV antenna on the top of a trailer house. When he lifted the extension it became tangled in some electrical wires and the plaintiff was knocked unconscious. When he regained consciousness, he was lying flat on his back on the top of the trailer house. He did not know with what force he was knocked down. This electrical shock burned holes in both of his heels about the size of the tip of his little finger. A doctor was called, but by the time he arrived

plaintiff had recovered consciousness and there was very little treatment given. Plaintiff did not see this doctor thereafter. On October 29, he consulted Doctor Siedenburg who treated the burns and sores on his feet. He consulted Doctor Siedenburg again on the 4th, 5th, 6th, and 7th of November, and so far as the record indicates, the treatment given was confined to the feet. Doctor Siedenburg testified as follows concerning this period: "Q Doctor, from the first visit to your office in the latter part of October, until he was hospitalized in November, did he at any time ever complain to you about back pains or problems to his back? A From what date? Q From the time he came in to see you the latter part of October, until he was admitted to the hospital? A Yes. He started complaining of his back while I was treating him for his feet. Q Do you recall specifically what those complaints were? A Well, when I first put this ointment on the soles of his feet, it worked real well, but then, the next day it didn't work as well, and the next day after that, not quite as well; because he was beginning to try to walk without putting his weight on his heels, and as he did that, he developed more and more backache. Q What do you mean by walking without putting the weight on his heels? A Well, you walk on the ball of your foot and try to take the weight on the front part of your foot rather than your heel. Q Is that what Mr. Snowardt was doing? A That is my understanding. He was trying to take the weight off the soles of his feet by putting more of it on the balls of the foot. Q In other words, he was balancing himself in an unnatural position, physically? A That's right. Q Now, did he do that continually until he was admitted to the hospital—the walking in this unnatural position? A Yes, he did. Q What was he admitted to the hospital for? A For back pain— severe back pain, radiating down in the right leg."

Plaintiff was admitted to the Kimball County Hospital on November 8, 1959, and placed in traction. He

was released from the hospital on November 22. On November 23 his difficulty returned, and he was referred to a neurosurgeon and admitted to the DePaul Hospital at Cheyenne, Wyoming, where he had surgery. Doctor Grizzle, the neurosurgeon who performed the surgery, testified plaintiff had sustained an injury to his intervertebral disc which allowed it to protrude. Plaintiff was released from DePaul Hospital on December 4, 1959, and returned to work about April 1, 1960.

In 1956, while doing construction work for another employer, plaintiff hurt his back. He was taken to a medical clinic. The doctor told him he thought that vertebrae were injured, and injected some medicine around the area of the injury and gave him some pills. He later went to a chiropractor, who X-rayed his back and told him two vertebrae had slipped out and were pinching a nerve. The chiropractor gave him four or five treatments thereafter. On this occaison, plaintiff missed 2 days of work, and thereafter on this job did only light work. He quit after 10 days and went back to a previous employer, Solomon Mills at Buda, Nebraska, working 7 days a week.

Doctor Calkins, a Kimball physician, testified the plaintiff consulted him on November 13, 1958, for back pain. The doctor's record has a notation under that date, "Low Flank & back pain." The doctor testified he treated the plaintiff on that occasion, but the plaintiff denied ever consulting him. Doctor Calkins was treating other members of the family, including Mrs. Snowardt who was pregnant. Her record was kept on a separate card, and this record designates "Mr." rather than "Mrs." and lists the plaintiff's correct age. This testimony is not material on the question of injury, because there could be recovery if plaintiff proved the activation or aggravation of a preexisting injury. Maul v. Iowa-Nebraska Light & Power Co., 137 Neb. 128, 288 N. W. 532. It is material, however, on the question of plaintiff's

credibility and that of his wife. They both testified that the plaintiff had fully recovered from whatever difficulty he experienced in 1956, and that he had no back difficulty whatever until the accident of September 6, 1959. In this respect, it is also to be noted that Doctor Masek, a chiropractor and therapist consulted by plaintiff after the October 27th accident, testified that plaintiff's history indicated he had had some back trouble periodically just about a year and a half prior to November 5, 1959.

Doctor Grizzle testified that from the history he received he presumed that the injury of September 6, 1959, weakened plaintiff's disc. In this regard, as will be set out later, Doctor Grizzle received no history of any previous back difficulty. With reference to the accident of October 27, Doctor Grizzle's testimony is as follows: "A It may be that his fall aggravated his back condition. However, and since we can only go by his statement, at the time, he indicated that it did not aggravate his back. Q In other words, in your opinion, it is a condition that he had prior to the fall, from what you know of the history? A From what I know of the history, yes, this protruded disc could have started before his fall. * * *."

Doctor Grizzle further testified: "Q Didn't the patient's history indicate that afterwards, the pain caused by the scuffle had pretty well cleared up? A Yes. Q Hadn't his condition improved considerably, Doctor? A No. I don't have the original—does somebody have the original? They took my original history. MR. HEATON: Hasn't that been sent back to you? I thought I mailed it to you—I am sorry. Q Doctor, let me ask this question? A Yes. Q Assuming that Mr. Snowardt's own story to you was that after the injury, if there was an injury from the scuffle—A Yes. Q —his condition improved considerably, and it wasn't until after the fall on the trailer roof that he again experienced considerable pain, would that change your opinion, assuming that, Doctor? A Assuming what you have just said would

be true, it would only be my opinion to the effect the second injury caused his disc protrusion to come out again. Q Well, would it be possible under that assumption, that the second fall actually was the cause? A Not with the history that he gave me of the original injury. Q Even though the pain had disappeared? A Yes, even though the pain had disappeared, because— that is what we got into such a long discussion about. This is as if you had a rock and you are moving it toward the edge of this desk—you move it two feet—it starts at three feet, and you move it two feet, and then a week later you come along and move it another foot and it falls off the edge of the desk; which act actually caused the rock to fall off the desk? You see my point? Q But, can you say from the history that you have of this patient, that this scuffle referred to was actually the first movement of the rock? A That is what I assume, from what the patient told me. Q But from what he told you, there were several other things that could have been the first instance, were there not? I mean, from this history, can you say positively that the scuffle caused the protrusion, in the first instance? A Well, we are at a philosophical point, aren't we, here? We have to accept what the patient says as true when he came to me the first time seeking treatment. Q You are aware of the patient's history of back trouble prior even to the scuffle, are you not? A *No; because he didn't discuss too much of that with me.* Q You didn't discuss his physical condition or his back condition at all, prior to the scuffle? A We do in the course of our interrogation of the patient, but usually at that time, if the patient has had trouble before, he usually admits it. Q Well, in this particular case, was there no discussion of any prior difficulty with the back? A No. I don't have any note of it on here. * * * Q With a protrusion, Doctor, would you say it was usual for the back to pain for a while and then stop? I mean, does the condition better and worsen over a period of time? A Yes, it is

characteristic—I think if we got a—really, a case history of every patient that has a disc, sooner or later we find that over a period of time they will have periods of ups and downs with this thing, if they have been untreated by surgery. Lots of times they start from one injury, and then maybe a year or so later they will have another problem. And this, I think we touched upon on our previous deposition too, and we said that for our purpose, all we could do is take the injury that put the man out of commission. Q And then you assume that this is the original cause? A We assume that is, yes. Q *But that assumption would be definitely affected if there was history of prior injury to the back, or prior treatment to the back for pain?* A *I think if there is a definite history to the back, yes, that it would.* Q And where you have two injuries fairly close together in time—A Yes. Q —*you definitely are not saying that you can tell which caused the protrusion originally, are you? In other words, it could be caused by either injury, when they are close together in time?* A *Yes.* Q Even though the first injury was associated with the back? A Right. And again, we go on the history to ascribe which injury was responsible." (Italics supplied.)

The plaintiff worked every night without interruption from September 6 to September 23, 1959, but he did not work the night of September 23 which was the day he consulted Doctor Siedenburg and the chiropractor. He worked continuously after September 23 until November 8, when Doctor Siedenburg put him in the hospital. The only testimony as to the plaintiff's continuous difficulty from September 6 to November 8, 1959, was that of plaintiff and his wife. Plaintiff's testimony was that he had severe pain in his lower back at all times after September 6. He testified: "It was almost impossible for me to bend over to put on my shoes and tie them and put on my overalls or trousers. I would have to either throw them at my feet or have my wife start them on."

The history plaintiff gave to the neurosurgeon was to

the effect that the electrical shock caused him to fall to his buttocks on the top of the trailer house. The doctor's testimony from the history further indicates that the plaintiff told him he was not aware of any increase in his lower back discomfort after this fall until approximately 1 week to 10 days later when his right leg began to pain him severely. It is evident that plaintiff minimized the accident of October 27, 1959, when he consulted Doctor Grizzle. It is undisputed, however, that he did not experience the pains shooting down into his right leg until at least a week after October 27. It does seem that if plaintiff could do no bending or lifting as his wife testified, or if his back troubled him between September 6 and October 27 as much as his testimony would indicate, that it would have been difficult and unusual for him to climb to the top of a trailer house to install an extension on a TV antenna. It does test credulity to believe that plaintiff could have been knocked unconscious, flat on his back, and not have suffered an increase in his back discomfort if it was as constant as he testified it was. Triers of fact are not required to accept as absolute verity every statement of a witness not contradicted by direct evidence. The persuasiveness of the evidence may be destroyed even though not contradicted by direct evidence. Dworak v. City of Omaha, 172 Neb. 209, 109 N. W. 2d 160.

For plaintiff to obtain a recovery herein he must adduce competent evidence having probative value which predominately convinces the trier of fact that he sustained an accident on September 6, 1959, which resulted in the disability for which he is now seeking compensation. As we said in McDuffee v. Seiler Surgical Co., Inc., 172 Neb. 325, 109 N. W. 2d 384: "The burden of proof is upon the claimant in a workmen's compensation case to establish by a preponderance of the evidence that personal injury was sustained by the employee by an accident arising out of and in the course of his employment."

Where there have been two accidents to an employee, the question of whether the disability sustained by him should be attributable to the first accident or to the second accident depends on whether or not the disability sustained was caused by a recurrence of the original injury or by an independent intervening cause. Where the first accident is not a proximate cause of the second accident, the second accident constitutes an independent intervening cause. See Towner v. Western Contracting Corp., 164 Neb. 235, 82 N. W. 2d 253. Plaintiff makes no contention that the first accident had anything to do with the second one. His contention is that his disability on November 8, 1959, had no connection with the accident of October 27.

The plaintiff argues that the Workmen's Compensation Act is to be liberally construed so that its beneficient purposes may not be thwarted by technical refinement of interpretation. This is the rule followed in this jurisdiction. However, the liberal construction referred to applies to the law and not to the evidence offered to support a claim by virtue of the law. The rule does not dispense with the necessity that the claimant shall prove his right to compensation by a preponderance of the evidence and it does not permit a court to award compensation when the requisite proof is lacking. Klentz v. Transamerican Freightlines, Inc., 173 Neb. 53, 112 N. W. 2d 405.

Both the judge of the compensation court and the district court found the accident of October 27, 1959, to be the cause of plaintiff's hospitalization and surgery. It is not necessary to discuss the sufficiency of the evidence on that point. It is sufficient in a determination of this appeal to state that, as we view the record, the plaintiff has not sustained the burden of proving that the accident sustained by him on September 6, 1959, was the proximate cause of the disability for which he was treated subsequent to October 27, 1959.

We have said many times that an award of compen-

sation under the Workmen's Compensation Act may not be based on possibilities, probabilities, or speculative evidence. Towner v. Western Contracting Corp., 164 Neb. 235, 82 N. W. 2d 253.

For the reasons given above, the judgment of the district court was in all respects correct and is affirmed.

AFFIRMED.